12-12 IN RE FOX May it please the court, my name is Michael Bressman and I represent the appellant Marsha Fox. The context of this case is critical. Ms. Fox operates a small business in South Carolina, home of the University of South Carolina Cox. For more than 30 years, she has sold rooster-shaped lollipops without complaint. She has sold those lollipops in clear wrappers so that her customers can see the product and she has sold them in displays that have a farmyard. Suppose she was selling sweaters. Would this case come out differently? Suppose this case... Sweaters. Suppose she was selling sweaters and the trademark were claimed for sweaters. If they claim for sweaters, then that might be a descriptive mark, Your Honor, and that case might come out differently. In this case, there's not... Descriptive mark? If it's sweaters for sweaters? No, she claims the word cocksucker as a mark for sweaters. Oh, I'm sorry, I misunderstood you. I misunderstood you. Yes, then this case would come out differently, Your Honor, because cocksucker could only have a bolder meaning in that context, Your Honor, because cocksucker in this context serves the double entendre. It serves both the rooster-shaped lollipop, rooster lollipop is literally one meaning, and the second meaning when you combine the words together is one who performs fellatio. Well, why should it make a difference that it could have two meanings if one of them is vulgar? Well, this court's precedent says that if a... In a context where we have both a vulgar and a non-vulgar meaning, the PTO cannot rely solely on dictionary definitions. In this case, the evidence that they relied on was solely dictionary definitions. Well, let's assume that it's an open question to the case. Well, if it was an open question, the other aspect of this case is that we have been reluctant, the court has been reluctant, and the PTO has been reluctant to make vulgarity determinations when it's a close call. There's nothing close about one of the meanings here, right? For the single word, Your Honor, that's true, cocksucker, but in this case, we have two separate words, and that is important here. Not only do we have the two separate words, Your Honor, we also have the rooster design, and all this is in an effort to pull away from any vulgar meaning. It's perfectly okay... Pull away from it, or to suggest that there are two possible meanings? Well, Your Honor, a person who does not know the vulgar meaning of the one word cocksucker is not going to learn it from my client's product. My client's product is the two separate words, and in the dictionary, the primary definition for cock is a rooster. Well, I want to come back. Why should it make a difference that there are two meanings if one of them... Let's assume, hypothetically, that one of them is clearly vulgar. Everybody would understand it, and it has this other meaning. There's a prompt. What difference does it make that there are two meanings instead of one, if one of them is clearly vulgar? Well, Your Honor, I think the problem, though, is that if we presume that the meaning is vulgar, and I'm willing to concede that many people may find the meaning of the one word cocksucker vulgar, but nonetheless, the demand from this Court and the rule that the PTO has had to follow is we have to figure out what a substantial composite of the general public believes, and we don't know that based on the evidence in this record. Well, let's assume that a substantial composite views this as having one meaning that's vulgar and one meaning which isn't, that it's a double entendre. Why should double entendres escape the prohibition on vulgarity if one of the meanings is clearly a meaning that everybody would view as vulgar? There's a Supreme Court case, a Pacifica case, a seven-dirty-words case. This is one of them, right? Correct, Your Honor. So, why should it make a difference that there are two meanings rather than one? Because, Your Honor, in every double entendre case, there is, in this area, in the scandalous area, one definition is vulgar and one definition is not vulgar. Black tail. We had a definition that was vulgar, and we had a definition and a meaning that was non-vulgar. Every double entendre presumes that there's a risque meaning, and the fact that there's a risque meaning, though, has not barred registration. And in other contexts, in trademark law, descriptiveness, double entendres can override descriptiveness. Surname refusals, double entendres can override surname refusals. The presumption of the law is that we will register unless we are declared scandalous. And I don't think, when you have a double entendre, you can go straight to that conclusion, that substantial composite. Seeing this mark, this whole mark, with this product can necessarily assume that the mark is vulgar in this context. I concede that the word cocksucker, single word cocksucker, has a vulgar meaning for a number of people. But we do not know what a substantial composite of the general public would think in this context, faced with a rooster-shaped lollipop in a non-obscene setting with two separate words and a rooster design. Let's take away the rooster shape. I'm troubled by the separation of one word into two, where that one word clearly has only one definition. And then you could sort of circumvent that by separating the two words out and finding independent definitions for each of those two words. When you say the word, it's one word, which is not subject to debate and not subject to two meanings. So what is there that it can point to that allows you to do that and avoid this finding of vulgarity or scandalous? Well, two points, Your Honor. The fact that, and I concede that when you pronounce them, while there might be a slight difference, for most people they're not going to notice a difference between the one word and the two words. That's only one sense of commercial impression. You have to look at all the considerations. And again, they would encounter it with a rooster-shaped lollipop and with a design. Well, let's assume there's one word. Let's assume we have a case and it's one word, that we don't think that it makes a difference, that you can avoid the result by separating those two words. Then what do you have left? You lose, right? You have one word. If she had filed as a one word mark? Right. In this case, yes, she would lose because the one word only has the one definition. But in this case, she did separate them apart. And I think that's critical in this case. I recognize that the Director and the Board cited a number of cases where they said a space does not matter. And that's true. In most cases, adding a space between two words to separate a word is not going to make a difference. However, those cases were all situations where there was no double entendre nor was there a design involved with that. The IBM case, e-server with a hyphen, e-server without a hyphen, in both cases means electronic server. Screen wipe with a space or screen wipe without, in the Gould case, has the same meaning. Is it your view that our case law compels any time where it's given that there's a double entendre that it's insufficient to rely on that you need a record? Is that your view of our cases? And if so, which case do you get that? Well, I think the Boulevard case says if all definitions go to one meaning, go to one dictionary meaning and that the goods that are being sold under that go to that one meaning, then you do not have to go beyond dictionary definitions. But in this case, but I think this case is more like MVETI where you have two separate meanings and again, the board conceded. I didn't say, can you point to something in MVETI where they said automatically if there's a double entendre it's sufficient to send you back on remand? Well, I think Boulevard said a little more about that than MVETI, right? But Boulevard was interpreting MVETI as well in a way that wasn't necessary to its holding, right? No, I think it was necessary because up to that point they had confronted the dictionary definition question. Well, Boulevard doesn't say if there's a double entendre, you get a free pass, right? No, Boulevard does not say with a double entendre you get a free pass per se, but I think Boulevard does say that if there is a double entendre you have to rely more on the dictionary definition. In 10 years... Does it occur to you that MVETI doesn't actually use the phrase double entendre? No, I don't think so, Your Honor, because clearly they were interpreting it as if it were a double entendre. One was a vulgar meaning and one was a non-vulgar meaning, and Boulevard clearly states that it believed that MVETI was a double entendre. So I don't think that hurts our case here, Your Honor. But going back to it, what I was going to say is this case has been sitting before the PTO for 10 years, granted some of it was on suspended time, but in 10 years the PTO produced nothing besides a few dictionaries for the word cocksucker, and that's all they produced. They didn't produce internet articles I don't understand. I mean, everybody knows what it means. I mean, are you agreeing with Judge Proust that if it was combined to a single word and there was no space, that you'd lose? I think it would be a much closer call. I think it would be a much closer call, but I do think Would you still win, or would you lose? If this were a single word? It probably we would probably lose the case because then she was clearly going to the definition of one who performs fellatio. The fact that she separated out as a product that is clearly a rooster lollipop derived from the dictionary definitions that the consumer statements that were in the record all these sorts of things point to the fact that people do not necessarily find this more offensive. Quite the contrary. I mean, I read those comments as saying they found it very humorous and clever because they understood what the real meaning was that everyone would understand and they created such a way to play on what everybody understands is the meaning. So I wasn't clear on why all those comments helped your side. I thought they were cut the other way. Sorry, Your Honor. Interestingly the examiner on page 122 of the record did say they'd help our case. However, the examiner said because there were only 30 of them, they could not demonstrate a substantial composite of the general public thinks. And now the board has come back and is trying to say, well no, in fact it shows a substantial composite of the general public finds this offensive. I don't think you can have it both ways here. What I'm simply saying, Your Honor, is it can't be offensive if it's humorous? I think it can be offensive to some number of people and still be humorous. But again, Your Honor, the board the PTO has a responsibility to figure out what a substantial composite of the general public thinks. And what general public are we looking at? Are we limited in the geography because she markets in a limited territory where they have these sporting... No, Your Honor. No, Your Honor. Cots that are cocks? No, Your Honor, although that's obviously a big part of the general public, but no, Your Honor. It would be nationwide. But again, all the PTO has ever relied on is some dictionary definitions here. They've never done internet research 10 years. No internet research. 10 years. Didn't cite one article. These are all the things that Babetti tells you you're supposed to be doing. But internet research and articles that go to what? What's the definition of determined? That would show whether the word cocks... the two words cocksucker would be offensive. That they support vulgarity. In fact, Your Honor... What if you look up the two words and it all comes back that, well, used together. If they're together, if they're hyphenated, or if they're used as one word, it's uniformly vulgar. What are they to do with that? Throw it out because they're not separate words? But businesses have the ability to use separate words in different ways. I mean, just because there's a dictionary definition for the one word doesn't necessarily mean when separated it keeps that dictionary definition. Especially when those separate dictionary definitions lead to a different result. One, again, that the PTO, the board has conceded was a double entendre. And I would just add, Your Honor, that if you look at the record on page 119 the examining attorney did do research to address the issue of whether the two words cocksucker have a scandalous meaning. And he said after quote, extensive research, he found no definition for the two separate words nor did he find any scandalous use of the two words in the marketplace. So that would seem to support that this may have a separate meaning a non-scandalous meaning. But again, Your Honor, there have been many cases Mavetti, Ritchie, In re over our heads where it's gone, where questions of double entendres, questions of potential vulgarity, it's been sent out to be published and let the public comment. If the public has a problem with it, they will comment. And we will then be able to make a broader record a more detailed record to make the determination. We're all assuming the public finds this mark, two separate words with a rooster lollipop in this context with a rooster designed to be scandalous. We don't know that because nobody has ever bothered to get to that level. They didn't provide any internet research, they didn't provide any articles. The only research they've done seems to support that nothing was found and when faced with that situation, Mavetti would seem to urge us to go and publish it and see what the public has to say about it. Okay. Do you want to reserve your rebuttal time? Yes, Your Honor. Thank you. Mr. Casagrande, is that the way you pronounce it? Casagrande, Your Honor. Good morning and may it please the Court. The difference between this case and Mavetti is Mavetti is a case about ambiguity. It wasn't at all clear what the public was going to think of the mark black tail. Here, I think, in light of what Ms. Fox's counsel says, it's very clear that the term cocksucker is vulgar. Doesn't Boulevard case suggest that once you establish that there are two meanings, which I think the Patent Office concedes here, they call it a double entendre. That's what it means. That you need something more than that. This is a double entendre, but it's a different set of circumstances than we had in Mavetti. Mavetti was a case where there was an ambiguity. There was no real evidence about which one of those definitions that the public would choose. Here, we've got a concession, and Ms. Fox has conceded it from the very beginning that she wants this to be a case where people get the juxtaposition between the vulgar and the non-vulgar for purposes of humor. How is that different from the Hershey case? How has the Board distinguished its conclusion here from the decision they made with respect to Big Pecker? How can we say that one is okay and the other is not? Here, what you've got is a case where every single dictionary definition that was in the record shows that the two terms together have a vulgar meaning. And that was a case, I believe the mark there was Big Pecker brand, and that was a case in which there wasn't any sort of definition of those words altogether. Meaning that there was no definition in the dictionary that didn't have a space there, but they didn't cite any meaning for the words Big Pecker that had anything other than a vulgar meaning, did they? Only when you separate the words could they then say it was okay. And here, if you separate the words, it's almost the exact same analysis. Pecker has different meanings depending on the context, and here the two terms together have only one meaning. Suppose we find the two are inconsistent. Where do we go? I mean, obviously a Board decision is not binding on us, but is it binding on the PTO? No, it's not, Your Honor. I think this Court's in each individual case before it, the PTO is to apply the prohibitions in Section 2 to make sure they make the correct determination about whether a mark can be registered, irrespective of whether or not there may have been mistakes made in prior cases under those sections. Is it your argument that the word cock has no independent non-vulgar meaning? No, it clearly does, and in this case Ms. Fox has tried very hard to run away from that meaning in order to create a humorous double entendre. I think, you know, her counsel mentioned at the beginning of this argument that she tried very hard to pull away from that meaning, and she used the designs in order to try to do that, but what he's seeking is a rule that if there's a double entendre, it automatically goes to registration, and he cites for that a TMEP section that the scandalousness and descriptiveness are two subsections under Rule 2, and they have very different language. A merely descriptive mark, a mark that consists of something that is merely descriptive cannot be registered, but the prohibition there is, again, mere descriptiveness, whereas in Section 2A dealing with scandalousness, the statutory prohibition is for marks that consist of or comprise comprise means include scandalous matter. So while there may be a basis for creating a double entendre rule with respect to descriptiveness because that takes it out of being merely descriptive, there is no statutory basis to do that with respect to scandalous marks, and he clearly has conceded that one meaning of the double entendre is a profane or vulgar meaning, and so that comprises a scandalous matter. Does he really ask for an absolute rule as it relates to double entendre? I mean, he clearly says that if it were just a double entendre, but we were using this in connection with sectoid, then it would be a different analysis. Meaning, so he's not asking for the broad rule that you're proposing, right? Well, it's unclear from the brief. I think he's both advocated for a broad rule and a rule that's somewhat narrower. The broader rule that he's advocated for is basically a double entendre gets an automatic pass under Mavity, and at other times he said a double entendre gets a pass if there's only dictionary definitions in support of the scandalous misfinding. But here we've got more than that. We've got admissions throughout the prosecution history, and indeed in their brief to this court, that there is a vulgar meaning. He said earlier in the argument that most people, even those who get the double entendre, will understand the vulgar meaning. And that is what causes them to get the double entendre. The point I was making, and I think you're missing, is that the context in which the mark is being used and has historically been used is relevant, is it not? It is relevant. And there's a lot of cases where there's a word that might be a double entendre where the board or the courts have said no because you're only using it in the vulgar context. That's correct. So we have to look at the context in which it's being used. Absolutely. But I don't think looking at the context in which it's being used is quite as clear as simply having something that's kind of innocuous as the product and not something that's related to the sex industry or pornography or something like that. Here, when the court looks at the goods, I think you've also got to take into account that these are goods that are generally going to be available to the public, including parents shopping with children. And that is something that the TTAB specifically mentioned in its decision. But I don't think you're responding to Judge O'Malley's question. And as I understand it, it's in the context of these goods. These goods very clearly demonstrate the alternative meaning. That this is a chocolate lollipop in the shape of a rooster. So it sort of brings forward the alternative meaning. Right? I agree with that. It does bring into play a second meaning. And isn't that significant? Of some significance, at least. It is of some significance. I think it makes it a more difficult case than the instance where it was sweaters and there was no double entendre. But why isn't that enough to at least if you say, okay, well we don't want a blanket rule for double entendre anytime there's conceivably two meanings. It's not enough. Why isn't the rule a more limited rule which is anytime there are two meanings and clearly the product is operated in the context which clearly demonstrates the second alternative meaning. Why shouldn't that at least be sufficient? I don't think this is an example where the product clearly demonstrates that only the second meaning is the operable meaning and in fact... It's an accurate description of the product, right? Yes, it's basically... And that's a non-vulgar description of the product. It's a generic, non-vulgar description of the product, right? Yes, that's right. So why isn't that enough? Because under Section 2A, Your Honor, if the mark comprises scandalous matter, that is what the prohibition is against registration. It's not something that has to be merely scandalous. It's something that comprises scandalous matter and a double entendre of the nature that Ms. Fox is advocating for is something that comprises, includes, scandalous matter. Are there no further questions? Thank you, Mr. Casagrande. Mr. Pressman? Just a couple quick points, Your Honor. First, to be clear, Ms. Fox is not asking this Court to rule whether the two words cocksucker is vulgar or not. What she is asking this Court to do is to direct the PTO to do its job or to recognize that the PTO has not done its job. Again, in 10 years, they could have provided search's articles, something to support to take this out of the situation. We're not advocating a rule, any time there's a double entendre, you automatically get published. We're advocating a rule that if there's a double entendre and the PTO doesn't do its job and doesn't bring in any other evidence other than dictionary definitions, that that's not sufficient. That's what Boulevard and Mavetti tell us, that they have to provide more. PTO does this all the time. The Luxuria case, that's the middle finger bottle case, they brought in internet search. Mackman, the cocktails case, they brought in internet searches. All those sorts of things would provide more evidence. PTO simply just did not do its job here, and that's why at this point it needs to go back to be published. What's that supposed to do? What are you saying? The PTO, to do its job properly here where you have a double entendre with both a vulgar and non-vulgar meaning must show more than dictionary definitions. What's the internet search of what? If it thinks that the two words are objectionable and it does an internet search and it finds words... With a space. Or they could have even done it without. If they think that it truly is the same, they could have done it without the space and produced all of that. But they didn't do anything like that. Why would an internet search of the one term, would that override uniformly all of the dictionary definitions of that one term with no space? No, Your Honor. What I'm saying is if they truly believed that there was a difference between the two, then they should have been able to do searches of each one. They should have been able to do searches of each one of them and found internet information. Or they could have found articles. Mavetti and Boulevard seem to say, the way I read them is, if there's a double entendre, which we have shown here, which the Board has conceded, then they need to do more than just rely on dictionary. Can I ask, you said earlier, and I guess it displays my lack of familiarity with the process itself, you talked earlier, not about just internet searches, but about publishing this for public comment. Right. Is that sort of one and the same in your view of internet, or that's a different point? No, no, no. They could do one of two things in your view? Correct, Your Honor. So if they wanted to prevent this from going to publication to support their position that this is unquestionably vulgar, they could have gotten more than dictionary definitions. That's how I read Boulevard and Mavetti, because we have a double entendre. Once they have not done that, if this were to be sent back, if they thought there was still doubt, as we saw, for example, in the Ricci case and some other cases, the other option is they could have sent it out to publish it and see if groups would truly object. Then we would have a true understanding of what a substantial composite of the general public thinks. And in fact, the Mavetti case that we've been talking about was ultimately sent back to the PTO, it was published, and people did object. And then the courts ruled, and the TTAB had a fuller record and was able to make a final determination in that case. No other questions? Thank you for your time. Okay, thank you, Mr. Rensselaer. Thank both counsel and the cases submitted. And that concludes our session for today.